Filed 5/11/23; Certified for Publication 5/31/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G060218 |
|       v. | (Super. Ct. No. INF10000236) |
| TRAVIS MARTIN CODY, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from an order of the Superior Court of Riverside County, David A. Gunn, Judge. Affirmed.

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Heather M. Clark, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

This is an appeal from a denial of Travis Martin Cody's petition for postconviction relief under Penal Code former section 1170.95.[1]

Under the prior felony-murder rule, if a death occurred during a listed felony, all the participants in the underlying crime could be convicted of murder. And under the felony-murder special-circumstance enhancement, if a participant was the actual killer, directly aided and abetted the actual killer with the intent to kill or was a major participant in the underlying felony who acted with reckless indifference to human life, then he or she could be sentenced to death or life in prison without the possibility of parole (LWOP). (§ 190.2, subd. (d); CALCRIM No. 703.)

In 2012, a jury found Cody and codefendant Steven Arthur Banister guilty of murder during a home invasion burglary/robbery and found true a felony-murder special-circumstance allegation. As to Cody, the trial court imposed an LWOP sentence plus two years. On appeal, this court found the trial court erred by failing to give the accomplice felony-murder special-circumstance jury instruction (CALCRIM No. 703), but we determined the error was harmless beyond a reasonable doubt. (*People v. Banister et al.* (Sept. 9, 2014, G049837) [nonpub. opn.] (*Banister*).)

The California Supreme Court later clarified the terms in the felony-murder special-circumstance statute. (*People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) [clarifying the meaning of "major participant"]; *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) [clarifying the meaning of "reckless indifference to human life"].)

In 2016, a federal court disagreed with this court and found the error in Cody's trial was prejudicial. The district court ordered the state to either (a) grant Cody a new trial on the felony-murder special-circumstances allegation, or (b) vacate Cody's special-circumstances enhancement and resentence him. (*Cody v. Gower* (C.D.Cal., May

---

[1] Assembly Bill No. 200 (Reg. Sess. 2021-2022) has since renumbered section 1170.95 as section 1172.6. (See Stats. 2022, ch. 58, § 10.) For clarity, we refer simply to section 1172.6 throughout. All undesignated statutory references are to the Penal Code.

2

26, 2016, No. EDCV-15-1497-FMO (KK)) 2016 WL 3025343 at p. *1.)

In 2017, the prosecutor elected not to retry Cody on the felony-murder special-circumstance allegation. The court then resentenced Cody to 25 years to life based on the murder charge, plus two years for two prison priors.

In 2019, the Legislature limited the scope of the felony-murder rule, which now mirrors the felony-murder special circumstance. (§ 189, subd. (e).) The Legislature also enacted section 1172.6, which allows persons to challenge prior convictions under the former felony-murder rule or the natural and probable consequences doctrine.

Thereafter, Cody filed a section 1172.6 petition, which the prosecution opposed. The trial court issued an order to show cause (OSC). After reviewing the 2012 trial transcripts (neither side offered additional evidence at the evidentiary hearing), the court concluded, "I think that the evidence has been proven beyond a reasonable doubt, that Mr. Cody was a major participant and did act with reckless indifference to human life, so I would deny the petition at this time." Cody filed this appeal.

We find the trial court properly relied on the 2012 trial transcripts at the evidentiary hearing, the court applied the correct burden of proof, and there is substantial evidence to support the court's factual determinations. Thus, we affirm the court's order denying Cody's section 1172.6 petition.


I

FACTS AND PROCEDURAL BACKGROUND

Because the only evidence introduced at Cody's section 1172.6 hearing was the initial jury trial transcript, we repeat the facts as they were summarized in the initial appeal. (*Banister*, *supra*, G049837.) We will supplement with additional facts as needed in the discussion section of this opinion.

"*A. Keeley's Death*

"Edward Keeley's daughter introduced her 75-year-old father to Linda Herzel. On August 9, 2009, Herzel and Keeley went to a matinee movie. After the movie, Keeley drove Herzel to his house in Desert Hot Springs in his new, blue Hyundai. He said he wanted to show her the 'little Western Town' he was building on a couple of acres. After he showed her around the project, they went out to dinner. It was still light out when they left the Mexican restaurant. Keeley drove Herzel home and it was dark by the time they went their separate ways. He called later that night to say good night.

"Arthur McNamera was a friend of Keeley's. Since March 2009, McNamera lived in his motor home 'just off' Keeley's property. McNamera said Keeley's property was unusual. It was approximately two acres and had a 'cowboy motif.' According to McNamera, Keeley collected 'everything.'

"In August 2009, Keeley had a new light blue Hyundai. Keeley was very happy about it and bought it on August 8, 2009. The next day, McNamera saw Keeley with a woman in the driveway on Keeley's property. That night, at about 9:30 or 10:00 p.m., Keeley telephoned McNamera and informed McNamera he (Keeley) had a tow job at 7:00 a.m., the next morning. Later that night, McNamera woke to the sound of Keeley's dogs barking. The barking was brief and stopped suddenly.

"When McNamera woke up the next morning, he saw Keeley's tow truck in the yard. McNamera thought that was 'kind of weird,' so he walked around Keeley's property and noticed the new Hyundai was gone. McNamera guessed the job must have been canceled and Keeley had gone to breakfast. A few hours later, McNamera telephoned Keeley, but there was no answer. McNamera called again after running some errands. Keeley still did not answer his telephone.

"McNamera saw a ladder leaning against the fence to Keeley's property and thought 'that's not right.' He walked to the back of Keeley's property, unlocked the back gate, and entered. When he approached the front of the residence, by the carport,

4

McNamera noticed the door was open and the Hyundai was gone. The open door struck McNamera as strange because Keeley had three dogs and always left that door locked, unless he was working outside, in which case he put an iron shackle on the door to make sure it stayed closed. McNamera walked inside the residence. He saw clothes were all over the place, which was unusual. Keeley normally hung his clothing on a clothesline and then folded them. The dogs were inside the residence. McNamera closed and locked the door. Then he saw Keeley's body at the bottom of the bed in the cabana. Keeley was in his underwear. Based on the amount of blood, the fact that Keeley was not moving, and flies were coming out of Keeley's mouth, McNamera did not think Keeley was alive.

"It was about 5:00 p.m. when McNamera found Keeley's body and then called 911. McNamera showed the law enforcement officers around the property. He said the inside of the house was in a state of disarray, 'everything was pulled out and thrown around like somebody was looking for something; just dump stuff out and pull the cushions off the couch and whatever.'

"David Eichelt, a deputy sheriff with the Riverside County Sheriff's Department, responded to the scene. He said the property consisted of 'a large fenced-in acreage' with a 16-foot high iron gate. The property had a Western motif with wagon wheels, long-horn skulls, and old wagons on the property. The property had a number of outbuildings, including a barn. Additionally, there were a number of broken down vehicles on the property.

"Eichelt went to what he described as Keeley's outdoor sleeping area with a free swinging bed suspended by four chains. Keeley was on his back on the ground. His feet were bound with a necktie. Another necktie was tied around Keeley's left wrist and there was a necktie by Keeley's neck. Keeley appeared to have defensive wounds on his right hand.

"Blood splatters were around Keeley, including on his bed. Near Keeley was a buttstock of a shotgun with blood splatters on it. The weapon's forestock was

5

found close to the buttstock.  The rest of the shotgun was found on top of a dresser, covered by hangered clothing that had apparently been removed from the closet.

"Deputies found 'numerous holsters and scabbards for horseback purposes and rifle cases all around the residence and property itself.'  They did not find a corresponding weapon for each holster.  Eichelt found two or three replica or inoperable guns in various states of disassembly.

"Troy Dehart, Keeley's son-in-law, was familiar with the contents of Keeley's home.  When he first saw Keeley's residence after Keeley died, it appeared as if it had been ransacked; tables were turned over, all the drawers were open.  Even the couch had been turned over.

"Dr. Joanna Young, the forensic pathologist for the Riverside County Sheriff's Department, performed the autopsy on Keeley's body.  Young said Keeley's face was 'fairly extensively damaged.'  He had multiple lacerations to both sides of his face and head, including large lacerations to both sides of his forehead, his nose, the top of his mouth, and his left ear.  Both his eyes had been blackened, and his skull did not appear to have its normal shape.  The bones of his lower face 'were crushed.'  Keeley also had defensive wounds on the back of one of his hands.

"Upon further examination, the skull was found to have been fractured around the right ear.  When she examined Keeley's neck, Dr. Young found Keeley's hyoid bone at the top of his airway was fractured in two places and there had been hemorrhaging around the bone.  There was some petechiae—very small pinpoint hemorrhages—in the right eye.  The broken hyoid bone and the presence of petechiae are indicative of strangulation.  A toxicology screen performed on Keeley's blood indicated no alcohol or illicit drugs in his system.

"Dr. Young concluded Keeley died 'due to strangulation, with other significant conditions of blunt force head trauma.'  Strangulation could have been caused by using a necktie or by someone using their hands.  The wounds to Keeley's face were

inflicted before he died. Those wounds are consistent with repeatedly being struck with the buttstock of a 'long gun.'

"B. *Keeley's Hyundai is Found*

"Dora Carter-Vinson lived in Desert Hot Springs in August 2009. Early one morning about 4:00 a.m., she and her husband woke up to what she thought was gunfire. She said they were used to the sound of gunfire, but this time it sounded like it was closer to their house than normal. They walked out onto their patio and, still hearing the 'popping noises,' called 911. A minute or two later, the fire department and police responded. When Carter-Vinson and her husband looked out of their backyard, they could see fire at the end of Two Bunch Palms, approximately a mile and a half from Keeley's property.

"Detective Martin Alfaro responded to the scene of a car fire at Two Bunch Palms, about 40 to 70 yards from the Carter-Vinson residence. Keeley's Hyundai had been burned. About 15 to 20 yards from the scene, Alfaro found a blue Bic lighter. The lighter was not dirty or muddy and appeared to have been recently placed there.

"C. *Search Warrants*

"Detective Kenneth Patterson executed a search warrant for Cody's Desert Hot Springs residence on August 13, 2009. There was a three-wheel ATV in the garage. A Davis Industries Derringer was found hidden in the back of a large screen television in the master bedroom. The Derringer was loaded with 'a CCI .38 caliber snake shot type of round.'

"Dehart said Keeley had a 'snake gun,' a Derringer, he used to deal with the snakes in the desert. Within a week of Keeley's death, Patterson asked Dehart to look at a Derringer. He recognized the Derringer as Keeley's, based on a scratch Dehart made on the handle the previous Thanksgiving. Shortly after identifying the Derringer as

7

Keeley's, Dehart and Patterson went to Keeley's property and Dehart showed Patterson the end table where Keeley kept ammunition. Ammunition found in the end table was 'the exact same' as the ammunition in the loaded Derringer found in Cody's residence.

"The sheriff's department also executed a search warrant on Banister and April Morris's apartment in Desert Hot Springs. Inside the residence, deputies found a red trunk lined with newspapers. Dehart identified the trunk as Keeley's.

"*D. April Morris*

"Morris testified Banister, whose nickname is 'Little Man,' was her boyfriend. They lived together in Desert Hot Springs in August 2009. She said she spent August 9, 2009, at the Spa Casino and Banister stayed with her that night. He arrived at the Spa Casino at approximately 3:00 p.m. and did not leave.

"Her testimony was impeached with statements she made to law enforcement in September 2009, when she returned to California after driving Banister to Tennessee. She told an investigator she had gone to a hotel with a friend, Tisha, and Tisha's daughter on August 9, 2009.

"During questioning in September 2009, Morris said she rented a car and drove Banister to Rockwood, Tennessee, where his family lives. She said she spent the night of the killing at a The Spa and Casino in Palm Springs. Banister checked in with her, but he did not spend the night with Morris. She picked him up the next day from her residence in Desert Hot Springs and took him back to the casino. Morris said Banister was 'being weird' when she picked him up. They gambled for a couple of hours and went to Morris's room. Morris kept asking Banister what was wrong and he kept denying anything was wrong. Finally, Banister said he 'screwed up' and may have killed someone. He said he beat up someone, but does not know if he killed him or not. Banister told Morris that Cody was with him at the time of the incident. Morris told him she did not want to know.

8

"Morris drove Banister to Tennessee three days after their apartment was searched.  Banister said he wanted to see his family and did not want to spend the rest of his life in prison.  Morris returned to California, but Banister stayed in Tennessee.

"*E.  Telephone Calls*

"Three telephone calls Banister made from the Roane County jail in Tennessee were recorded.  Inmates without enough money can make a call using their booking number as a PIN number.  The female voice on two of the calls was Morris's.  The third call was to Misty Camargo, Cody's girlfriend.  During that call, [Banister] asked Camargo, where Morris was.  Camargo said she had not spoken with Morris.  During that call, Banister said '. . . I need to get hold of my bitch so I can find out what she said to "em."'  Banister claimed someone 'told on' him.

"In one call to Morris, she told Banister the police knew where he was.  He said he would tell the police his grandmother was sick.  Morris told Banister that Cody had been arrested.  In a second recorded telephone call, Banister asked if the Spa Casino had video cameras.  Discussing an alibi, Banister wanted to know if anyone would be willing to say Morris and he had been watching a movie.  Banister stated he would say they fell asleep watching the movie.

"Cody's telephone calls from the Indio jail were recorded.  In a call to Camargo, he said he had been told what Banister was saying and that it did not look good for him (Cody).  The next day Cody called his mother.  She suggested he tell his side of the story and he said he was facing life in prison because he 'was there.'

"*F.  Statements of Cody's Acquaintances*

"Gabriel Contreras knows Alvin Hatley.  On September 3, 2009, Contreras told Investigator Button he was speaking with Hatley three or four days earlier, when a person named Travis approached Hatley.  Travis and Hatley walked approximately 10

9

feet away from Contreras and had a conversation. Contreras heard Travis say that he and 'Little Man' beat up someone 'really bad and left him in really bad shape.' Travis said he hit the victim and he and Little Man had burglarized the same person's home before. Contreras said Travis and Little Man were always together and he only knew Little Man from seeing him with Travis.

"Hatley testified Cody is like a brother to him. Hatley denied knowing Contreras and said he did not recall any conversation with Cody about Cody getting into trouble, Cody saying Little Man got into a fight and hurt the other person, denied knowing who Little Man is, and said he did not recall being interviewed by Button.

"Button testified he interviewed Hatley within a week of interviewing Contreras. Button asked Hatley if he had a conversation with Cody after Keeley's death. Hatley said he did. In that conversation, Cody said he and his friend 'did their thing,' or something to that effect. Cody said he got mixed up in something and could not go home.

"In April 2010, Michael Madrid's girlfriend Amber Morast made contact with the Desert Hot Springs Police Department on his behalf. Madrid was in jail at the time. Morast set up a conversation at the jail between Madrid and Sergeant Gustavo Paiz. Madrid provided the sergeant information about a murder. Madrid testified, however, that he did not use Cody's name and the first time he ever saw Cody was when he (Madrid) started going to court on the present case.

"Sergeant Paiz said he was contacted by Morast in April 2010. Morast said her boyfriend was in custody and wanted to give Paiz information about a homicide. Paiz went to the Indio County jail within a couple of days and spoke with Madrid, Morast's boyfriend. During the recorded interview, Madrid said it was 'not cool' that an old man was killed for nothing. He said he was at a friend's house when he spoke with Cody about what had happened.

"Cody told Madrid 'they' had burglarized buildings on Keeley's property a

10

couple of weeks before the murder, but this time they wanted to go into the residence. They intended on drugging the dogs, but it did not work. They forced their way into the residence and started rummaging through the house. They confronted Keeley and wanted to know where his valuables were. They ended up getting $400 and some guns. Madrid said 'John' was the one that 'smashed' Keeley with a gun and John fled to Tennessee where he was arrested. According to Madrid, Cody said things were not supposed to go that way it, but they got 'carried away.'

"*G. Defense Evidence*

"Brett McDonald has served four terms in state prison. He knows Banister and Morris, the mother of McDonald's oldest child. He said the trunk seized from Banister and Morris's apartment belongs to Morris and he helped her move the trunk on a number of occasions before August 9, 2009. According to McDonald, Morris owned the trunk 'for at least the last 10 years.'

"Banister testified he spent August 9, 2009, at the Spa Casino and hotel with Morris and did not kill Keeley. He denied telling Morris he had beaten up an old man. He said he went to Tennessee to see his grandmother because she had a heart attack, knee surgery, and a stroke. He felt if he did not go then, he would never get to see her again. When he asked Morris if the casino had cameras it was because, if it did, it would prove he was there that weekend.

"Banister said the trunk taken from his apartment has been in Morris's family 'for a while.' He said it had belonged to her son." (*Banister*, *supra*, G049837, fn. omitted.)

*Procedural Background*

In 2012, Judge Richard A. Erwood presided over a jury trial. At the conclusion of the trial, the jury found Cody (and Banister) guilty of murder and found

11

true the felony-murder special-circumstance allegation. As to Cody, two alleged prison prior allegations were found to be true. The trial court then imposed an LWOP sentence plus a determinate term of two years.

In 2014, Cody raised several claims on appeal, including the trial court's failure to instruct with CALCRIM No. 703 (the participation and mental state needed for an accomplice in a special-circumstance murder finding).[2] This court found instructional error, but found the error to be harmless beyond a reasonable doubt and otherwise affirmed the judgment. (*Banister*, *supra*, G049837.)

In 2016, in a habeas corpus proceeding, a district court found this court's application of the harmless error standard to be "objectively unreasonable." The court ordered the state to either retry Cody as to the special-circumstance allegation, or to vacate the allegation and resentence Cody for the murder conviction.

In 2017, the Riverside County prosecutor informed the trial court: "The trial testimony that was elicited did not support the notion that Mr. Cody was the person who strangled Mr. Keeley after he was beaten with the butt of a shotgun, and there was no evidence as to which of the two defendants did the actual strangulation.

"There was plenty of evidence that it was Mr. Banister who lost his cool and had assaulted Mr. Keeley repeatedly with the butt of the shotgun and inflicted those damages which the coroner concluded were inflicted while Mr. Keeley was alive. So that strangulation was the cause of death, and it had to follow the beating. And we did not have any evidence as to which one of them did the strangulation.

---

[2] "In order to prove (this/these) special circumstance[s] for a defendant who is not the actual killer but who is guilty of first degree murder as (an aider and abettor/ [or] a member of a conspiracy), the People must prove either that the defendant intended to kill, or the People must prove all of the following: [¶] 1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; [¶] AND [¶] 3. When the defendant participated in the crime, (he/she) acted with reckless indifference to human life." (CALCRIM No. 703.)

12

"The Court of Appeal felt that the only way we could have proceeded on that was with an aiding and abetting theory, and that's what is spelled out, and I think it is CALCRIM 703 that was not given in this case.

"So with the [federal habeas corpus] petition being granted on the grounds related to the special circumstances, the other claims were all denied . . . .

"The People had the option after that to seek a retrial on that issue, but the People in carefully analyzing the state of the evidence did not believe that we could meet our burden under CALCRIM 703 and show the things that made Mr. Cody responsible for that strangulation during the course of the robbery."

The trial court then resentenced Cody to 25 years to life for the first degree murder conviction, plus two years for the two prison priors.

In 2019, Cody filed a section 1172.6 petition seeking to vacate the murder conviction and to be resentenced. The court found Cody had established a prima facie basis for relief and issued an OSC.

In 2021, Judge David A. Gunn presided over a contested hearing regarding Cody's section 1172.6 petition. The parties submitted the matter based solely on the trial transcripts and argued their respective positions. At the conclusion of the hearing, the trial court orally denied the motion (the court's ruling will be covered in detail in the discussion section of this opinion).

II

DISCUSSION

Cody contends: A) the trial court improperly relied on the 2012 trial transcripts at the section 1172.6 evidentiary hearing; B) the trial court did not apply the correct burden of proof at the evidentiary hearing; and C) there is not substantial evidence to support the trial court's ruling. We shall analyze each claim.

13

*A. The Reliance on the Trial Transcripts at the Evidentiary Hearing*

Cody argues the trial court improperly relied on the 2012 trial transcripts at the section 1172.6 evidentiary hearing. We disagree.

When interpreting a statute, a court's role "is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) "We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.'" (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837-838.)

Section 1172.6 was designed "to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief." (*People. v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*).) A person may file a petition declaring that: "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of murder, attempted murder, or manslaughter following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted of murder or attempted murder[;] [¶] [and] (3) The petitioner could not presently be convicted of murder or attempted murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6 subd. (a)(1)-(3); see also § 1172.6 subd. (b)(1)(A).)

If the trial court issues an order to show cause (OSC), it must hold an evidentiary hearing "to determine whether to vacate the murder, attempted murder, or

14

manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1172.6, subd. (d)(1).)

As far as the evidentiary hearing, a prior version of section 1172.6 provided: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges. The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (Former § 1170.95, subd. (d)(3), repealed by Stats.2018, ch. 1015 (S.B.1437), § 4, eff. Jan. 1, 2019.)

Effective January 1, 2022, section 1172.6 now provides: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the hearing shall be governed by the Evidence Code, *except that* the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, *including witness testimony*, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens." (§ 1172.6, subd. (d)(3), italics added.)

15

"It's true that it's unusual to ask the trial judge to sit as the fact finder and (in some cases) make factual determinations on a cold record . . . . While that is not the ideal position for a fact finder, it is possible to review a trial transcript and reach an opinion about what actually happened. The Legislature landed on that compromise as a way of extending the ameliorative benefits of its redefinition of murder to people previously convicted under prior law, which they judged to be too harsh. They could have directed that qualifying offenders receive a new trial by a new jury on the critical factual questions. But that was impractical for many reasons; the expense would have been enormous and the chances of obtaining live testimony from witnesses who remembered the events from years or decades earlier is small. The Legislature also could have simply refused to make the benefits of the new law available to people already validly convicted under the old law. They chose the middle course of requiring trial judges to decide the critical factual questions based—at least in some cases—on a cold record. While the Legislature's compromise is not perfect, it is adequate. And if either party believes it's important to put on live testimony to allow the trial judge to make credibility determinations based on cues other than consistency and plausibility, the statute expressly allows them that opportunity." (*People v. Clements* (2022) 75 Cal.App.5th 276, 297.)

On April 22, 2021, the trial court admitted into evidence the transcripts (witness testimony) from Cody's 2012 trial. (See § 1172.6, subd. (d)(3) ["The admission of evidence in the hearing shall be governed by the Evidence Code, *except that* the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including *witness testimony*," italics added].) Neither the prosecution nor Cody chose to put on live testimony from witnesses or any other additional evidence. Although Cody's evidentiary hearing predated the January 1, 2022, amendment to section 1172.6, we find the trial court fully complied with the statute as currently written. Thus, we hold the court properly relied on the 2012 trial transcripts at the section 1172.6

16

evidentiary hearing.

Cody argues that under section 1172.6, the Legislature intended that when a trial court conducts an evidentiary hearing, the prosecution must always first make a showing that a witness is unavailable before his or her former testimony at trial can be admitted into evidence at the evidentiary hearing. We disagree.

"Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] (1) The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion . . . ; or [¶] (2) The party against whom the former testimony is offered was a party to the . . . proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." (Evid. Code, § 1291, subd. (a).)

To admit the former testimony of a witness, the prosecution must generally demonstrate that the witness is unavailable and that it made a good-faith effort to obtain the witness's presence at trial. (*People v. Wilson* (2021) 11 Cal.5th 259, 291.)

"The admission of evidence in the hearing shall be governed by the Evidence Code . . . ." (§ 1172.6, subd. (d)(3).) If the Legislature had stopped there, then we would likely agree with Cody's interpretation of the statute. That is, we would find the prosecution is required to make a showing of witness unavailability under Evidence Code section 1291, before the trial court could admit the former testimony of witnesses at the evidentiary hearing. However, the law has an explicit exception that provides for the admission of former testimony: "The admission of evidence in the hearing shall be governed by the Evidence Code, *except that* the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including *witness testimony* . . . ." (§ 1172.6, subd. (d)(3), italics added.)

Section 1172.6, subdivision (d)(3), does contemplate that there may be some evidence that was admitted at a former trial that would not be admissible under

17

current law. (See, e.g., *People v. Sanchez* (2016) 63 Cal.4th 665, 686 [an expert cannot relate case-specific out-of-court statements to support the expert's opinion].) However, that does not mean that all witness testimony at a prior trial cannot be admitted without the prosecution making a showing of witness unavailability. In this case, Cody has not identified any specific evidence that was admitted at the 2012 trial that he now argues would be inadmissible under current law.

Were we to adopt Cody's interpretation of section 1172.6, it would mean we would have to disregard the statute's plain language. Further, it would mean that all section 1172.6 evidentiary hearings would effectively become new court trials. As another appellate court recently stated, that is plainly <u>not</u> what the Legislature intended. (See *People v. Clements*, *supra*, 75 Cal.App.5th at p. 297 [the Legislature did not choose to grant qualifying offenders under section 1172.6 a new trial, but rather the Legislature chose a procedure "requiring trial judges to decide the critical factual questions based—at least in some cases—on a cold record"].)

Again, we find the trial court did not commit an error by relying on the transcripts of the 2012 trial at the section 1172.6 evidentiary hearing.


**B. Burden of Proof at the Evidentiary Hearing**

Cody argues the trial court applied the wrong burden of proof at the evidentiary hearing (something other than beyond a reasonable doubt). We disagree.

In this part of the discussion section, we will: 1) review relevant legal principles; 2) quote directly from the trial court's ruling; and 3) analyze the law as applied to the trial court's ruling.


*1. Relevant Legal Principles*

Effective January 1, 2019, the Legislature amended "'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure

18

that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.'" (*Gentile*, *supra*, 10 Cal.5th at pp. 846-847; see Stats. 2018, ch. 1015, § 1, subd. (f).)

Section 188, subdivision (a)(3), now provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Section 189, subdivision (e), now states the only exception to the malice requirement—the felony-murder rule—which is now limited to circumstances where the defendant "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2 [the felony-murder special-circumstance enhancement]." (§ 189, subd. (e)(3).)

Ordinarily, the federal Constitution requires an intent to kill in order for an aider and abettor to be culpable under the death penalty. (*Enmund v. Florida* (1982) 458 U.S. 782, 797 (*Enmund*).) However, the United States Supreme Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." (*Tison v. Arizona* (1987) 481 U.S. 137, 158 (*Tison*).)

Applying *Enmund, Tison*, and related cases, the California Supreme Court has provided a nonexclusive list of factors to assist the fact finder in determining whether a defendant was a "major participant" in a felony murder, namely: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do

19

after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) The court stated, "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.'" (*Ibid*.)

Our Supreme Court has also analyzed the required mental state in a special-circumstance felony-murder allegation: "Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, '"[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."' [Citations.] 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement." (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

To determine whether the defendant had the requisite mental state (reckless indifference to human life), the Supreme Court has held: "We analyze the totality of the circumstances" in a manner that largely overlaps with our "major participant" discussion. (*In re Scoggins*, *supra*, 9 Cal.5th at pp. 676-677.) "'Although we state these two requirements separately, they often overlap,'" "'for the greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at p. 615.)

The factors the Supreme Court has identified to assist the fact finder in determining whether a participant acted with reckless indifference to human life include:

20

the defendant's knowledge of weapons and the use and number of weapons in the crime; the defendant's presence at the crime and opportunities to restrain the crime and/or aid the victim; the duration of the felony; the defendant's knowledge of the cohort's likelihood of killing; and the defendant's efforts to minimize the risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618-622.)

### 2. The Trial Court's Ruling at the Evidentiary Hearing

At the beginning of the evidentiary hearing, the trial court stated:

"The matter is here pursuant to [1172.6]. The Court had previously granted an OSC in the matter. This is our evidentiary hearing.

"For the record, I did review the approximately 2,000 pages of trial transcript that were imaged. I also reviewed, of course, all the moving documents that have been submitted by both sides. I've also reviewed some of the cases."

Prior to hearing arguments, the trial court stated:

"For the record, I would note that I am an independent fact finder at this point. That is why I reviewed the trial transcript or at least the portions that were available to me. It's still a cold record in many ways, but, again, that's what the courts have -- have happened. I would find that, again, to sustain the conviction in the matter that the People must prove the charges beyond a reasonable doubt."

When invited to argue the case, the prosecutor told the trial court "we agree that you're the fact finder, and I think we've set forth the facts in our brief. And I think unless the Court has any questions, I would submit on that."

The trial court then stated:

"That's fine. Again, the reason the Court granted the OSC in the first place, I think, was clearly because there was the instructional error. I think that was my primary focus, that a jury was not instructed with the *Banks* factors, but I do think that had a jury been instructed -- a reasonable and rational jury been instructed with the *Banks*

21

factors that they would have found that Mr. Cody was a major participant in the crime.  I think that's the first prong.

"I mean, again, this wasn't a situation where Mr. Cody was a getaway driver of a bank robbery.  I mean, this was an intimately -- he was intimately involved, rather, at all stages of this burglary.  I mean, they planned on how to commit the burglary.  They obtained implements to enable them to commit the burglary, a ladder.  They had a plan to disable the dogs that were in the victim's residence.  There was discussion that they had burglarized areas of the victim's residence before, but in reading the trial transcript, it seems that those were unoccupied buildings.

"When they made the decision to enter the residence on the occasion in question, it appears from the trial evidence that they knew this was actually the location of the victim's residence and where he lived and where he kept his valuables.  And, again, I think that it was their intention, and I find that based on the evidence that was introduced into trial to confront him about that, so that they could locate these valuables and seize those valuables in the course of the burglary.

"Given that, again, Mr. Cody was involved in all of the planning that I can see.  And obviously there were statements, some of which were maybe later recanted, but then the jury would have been free to believe those statements that were made early on in the investigation that they both were involved in the beating of the victim, that they both participated in getting information from him in terms of where those valuables were. Nobody mentioned in their briefs, but I think it's a reasonable inference from the trial evidence also that if I recall directly -- now, I'm speaking off the top of my head.  But there were at least two ligatures that were found on the victim's body, I think by way of neck ties, but my memory may be failing me.

"But, you know, it would be very difficult in a struggling victim for one person to have gotten these ligatures attached to the victim's body.  Maybe they did it after he was incapacitated, but there would have been no reason to do so at that point in

22

time. So it again seems to me that all the evidence points to both individuals, both Mr. Cody and Mr. Banister, both being involved in, again, the planning, the execution, and then later the beating of the victim that led to his death that occurred during the course of this burglary.

"Mr. Cody is found later on with items from the burglary. He's got the weapon -- the antique weapon that the victim had owned and possessed. You know, all those things point to him being a major participant in this crime. And I will say this.

"I think the appellate courts have been less than clear in the second prong, which is the reckless indifference to human life. But I just want to clear a couple things. One, it's from the *Clark* case. The Court noted that the two elements overlap. The greater the defendant's participation in the felony murder, the more likely that he or she acted with reckless indifference to human life. And I think that made sense.

"And then also quoted in the People's additional brief, and it's in the *Tison* case. So this is familiar to everybody. *Tison* is T-i-s-o-n. The Supreme Court held the brothers could be sentenced to death despite the fact they had not actually committed the killings themselves or intended to kill stating reckless disregard for human life implicit in knowingly engaging in criminal activities, known to carry a great risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that contact causes its natural, though also not inevitable lethal result.

"I think here every indication was they knew that the victim was present at the residence, essentially a home invasion burglary, if you will. They knew the victim would be present. That's why they took actions to surprise him by disabling the dogs, by using a ladder, by using other means to enter the residence, and because they wanted to find out where the valuables were.

"So, I mean, if you confront -- if you openly engage in a plan to enter an inhabited dwelling to commit a burglary, again you're -- obviously the odds are with you

23

that that person inside is going to try to prevent you from doing so, and so they had to be prepared for that contingency, and they were by taking actions that resulted in the victim's death.

"So, again, I'll let petitioner, if you want to respond to any of those comments or to [the prosecutor's] comments, certainly I would give you the opportunity to do so at this time." (Italics added.)

After hearing further argument from both sides, the trial court stated:

"And I think [Cody's counsel] retains a lot of his credibility by saying there -- acknowledging that Mr. Cody is certainly a major participant. I mean, he took -- again, as I said already -- and I don't want to keep reiterating it, but he was intimately involved in all stages of this planned burglary.

"And so we're clear -- at least I think we all agree . . . *Banks* sets out what reckless indifference is, although as I've said -- and I think it is true -- I think the appellate courts have been very poor about giving us much guidance in terms of what that second prong means, but here they note reckless indifference requires the defendant to be subjectively aware that his or her participation in the felony involved a grave risk of death.

"You mentioned hearsay testimony. But clearly, [defense counsel], I mean, a jury hearing the evidence in this case would have to rely on other factors, on circumstantial evidence, on, if you will, admissible hearsay evidence to make a finding as to what his subjective awareness was. But they can certainly also look at the circumstances of the crime. And as I've said, these are -- they're connected with each other.

"The major participation again is connected to the subjective awareness involved in the reckless indifference to human life, and I think, again, a reasonable and rational jury, I think -- well, of course I'm not saying what they would do. I'm the independent fact finder here, so let's be clear. And, again, it's a cold record, and what we

24

have are a lot of statements by Mr. Cody that certainly suggest that he was right there when the beating took place.

"Now, I acknowledge the fact that many of those people recanted their testimony at trial, but a juror or the Court in reading this record -- it would be better to, of course, hear these witnesses, but certainly it's often true that what people say at the beginning of an investigation, those individuals who are connected as friends and associates of the petitioner in this case, Mr. Cody, that it's not unusual that they would change their statements at some later time, in this case at the time of trial.

"So, again, I think that the evidence has been proven beyond a reasonable doubt, that Mr. Cody was a major participant and did act with reckless indifference to human life, so I would deny the petition at this time. That would be the Court's order."

### 3. Analysis and Application

At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).) Thus, "it is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing under section [1172.6]." (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).)

At the beginning of the procedure, the trial court noted it was conducting an "evidentiary hearing," that the judge was acting as "an independent fact finder," and the prosecutor agreed with the court "that you're the fact finder."

Although at one point the trial court alluded to what a "reasonable and rational jury" would do, the court immediately corrected itself by saying, "of course I'm not saying what they would do. I'm the independent fact finder here, so let's be clear." Further, when announcing its final ruling, the court said, "I think that the evidence has been proven beyond a reasonable doubt . . . ."

25

In sum, when we consider the transcript as a whole, particularly the court's explicit final ruling, we find that the trial court applied the correct beyond a reasonable doubt burden of proof. (See *People v. Abdelsalam* (2022) 73 Cal.App.5th 654, 662 ["In the absence of evidence to the contrary, it is presumed the court was aware of and applied the proper burden of proof"]; see also Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].)

## C. Substantial Evidence

Cody argues "the trial evidence was insufficient to establish appellant's guilt beyond a reasonable doubt." We disagree.

"The scope of our review for substantial evidence is well settled. The test is not whether the People met their burden of proving beyond a reasonable doubt that [a defendant in a section 1172.6 proceeding] was ineligible for resentencing, but rather 'whether *any* rational trier of fact could have' made the same determination, namely that '[t]he record . . . disclose[s] . . . evidence that is reasonable, credible, and of solid value— such that a reasonable trier of fact could find [as did the superior court].'" (*People v. Williams* (2020) 57 Cal.App.5th 662, 663.)

"'In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the existence of every fact the [superior court] could reasonably have deduced from the evidence. [Citation.] "Conflicts [in the evidence] . . . subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge . . . to determine the . . . truth or falsity of the facts upon which a determination depends."'" (*Williams*, *supra*, 57 Cal.App.5th at p. 663.)

We will now analyze whether there is substantial evidence to support the court's factual determinations that Cody was: (1) a major participant in the underlying burglary/robbery; and (2) he acted with reckless indifference to human life.

26

### 1. *Major Participant*

The applicable jury instruction states: "[When you decide whether the defendant was a *major participant*, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant was a major participant.] Among the factors you may consider are: [¶] [What was the defendant's role in planning the crime that led to the death[s]?] [¶] [What was the defendant's role in supplying or using lethal weapons?] [¶] [What did the defendant know about dangers posed by the crime, any weapons used, or past experience or conduct of the other participant[s]?] [¶] [Was the defendant in a position to facilitate or to prevent the death?] [¶] [Did the defendant's action or inaction play a role in the death?] [¶] [What did the defendant do after lethal force was used?] [¶] [<*insert any other relevant factors*.>]" (CALCRIM No. 703.)

Here, the police interviewed Madrid after Keeley's murder. The interview was recorded and placed into evidence. According to Madrid's statement, Cody told him facts about the murder and his role in the burglary. Cody said he and Banister had burglarized out buildings on the property a few weeks before, but on this occasion, they wanted to go into the home. They attempted to drug the dogs with hamburger meat and pills, but that plan did not work. Banister and Cody eventually forced their way into the home and started rummaging through the Keeley's house. According to Madrid, Cody said things were not supposed to end up the way they did, but he and Banister got "carried away." In short, Madrid's statements factually support the trial court's determination that Cody "was intimately involved . . . at all stages of this burglary."

It is also a reasonable inference that Cody played a role in Keeley's death and did nothing to prevent it. As we stated in the initial appeal, according to Dr. Young, the pathologist who performed the autopsy, "Keeley died 'due to strangulation, *with other significant conditions of blunt force head trauma*.' (Italics added.) The blunt force trauma referred to by Dr. Young included, 'fairly extensive[]' damage to Keeley's face.

27

'The bones of the lower face had been crushed.'  Additionally, Keeley had multiple lacerations to both sides of his face and head, including large lacerations to both sides of his forehead, his nose, the top of his mouth, and his left ear.  Both his eyes had been blackened, and his skull did not appear to have its normal shape.  The injuries to Keeley's head were so significant, Young viewed Keeley's death as a 'blunt force trauma case' and was surprised when she eventually found evidence of subsequent strangulation." (*Banister*, *supra*, G049837.)

"Although there was no evidence as to which of the defendants *strangled* Keeley, there was evidence both defendants inflicted the significant blunt force trauma that contributed to the death.  The day after the murder, Banister told Morris he had 'screwed up' and may have killed someone when he beat up the person.  Contreras heard Cody (whom he referred to as Travis) say he and Little Man (Banister) beat up someone whose home they had burglarized and left the person in 'really bad shape.'" (*Banister*, *supra*, G049837.)

Cody makes various factual arguments on appeal.  For instance, Cody argues that the record shows he "was a minor participant and Banister was the mover and the shaker in the robbery plans."  Cody also argues that "the evidence suggests that defendants brought the ladder to climb over the fence into the interior property, after which they would surreptitiously enter the house where the valuables were while Keeley was outside sleeping in his gazebo/cabana."

However, Cody's various arguments about the facts, and his additional contentions that go to witness credibility, misapprehend our role in a substantial evidence review.  Our role is not to reweigh the evidence, nor is it our role to judge the credibility of witnesses.  (See *People v. Swanson* (1962) 204 Cal.App.2d 169, 173; see also 6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Appeal, § 171, p. 455.)

Again, in a substantial evidence review, "we review the evidence in the light most favorable to the prosecution and presume in support of the [order] the

28

existence of every fact the [superior court] could reasonably have deduced from the evidence." (*Williams*, *supra*, 57 Cal.App.5th at p. 663.) In short, we find substantial evidence in the record supports the trial court's factual determination that Cody was a major participant in the robbery/burglary of Keeley's residence.

### 2. Reckless Indifference to Human Life

The applicable jury instruction states: "When you decide whether the defendant acted with *reckless indifference to human life*, consider all the evidence. No one of the following factors is necessary, nor is any one of them necessarily enough, to determine whether the defendant acted with reckless indifference to human life. Among the factors you may consider are: [¶] [Did the defendant know that [a] lethal weapon[s] would be present during the <insert underlying felony>?] [¶] [Did the defendant know that [a] lethal weapon[s] (was/were)likely to be used?] [¶] [Did the defendant know that [a] lethal weapon[s] (was/were)used?] [¶] [Did the defendant know the number of weapons involved?] [¶] [Was the defendant near the person(s) killed when the killing occurred?] [¶] [Did the defendant have an opportunity to stop the killing or to help the victim(s)?] [¶] [How long did the crime last?] [¶] [Was the defendant aware of anything that would make a coparticipant likely to kill?] [¶] [Did the defendant try to minimize the possibility of violence?" (CALCRIM No. 703.)

Here, we note that the trial court's factual finding that Cody was a major participant in the underlying felony is—itself—supportive of the court's additional factual finding that Cody acted with reckless indifference to human life. (See *Clark*, *supra*, 9 Cal.5th at p. 677 ["The greater the defendant's participation in the felony murder, the more likely that he [or she] acted with reckless indifference to human life"].)

As in many criminal cases, there is no direct evidence of Cody's intent or mental state, so the trial court properly relied on circumstantial evidence to determine whether Cody acted with reckless indifference to human life. "Circumstantial evidence

29

does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question." (CALCRIM No. 223 ["Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state . . . and neither is necessarily more reliable than the other"].)

The record includes evidence that Cody told his mother in a recorded jail call that he was facing life in prison because "he was there." And according to Maldonado, Cody told him that he had severely beaten the person (Keeley) and left him "in really bad shape." Cody told Maldonado, "I did it, I did it." And according to Madrid, Cody said that he and Little Man (Banister) "smashed" the victim with a gun. Thus, based on the circumstantial evidence, it is a logical and reasonable conclusion that Cody was present when the killing occurred.

Further, based on the ransacked condition of Keeley's home, it is also a reasonable inference that Cody and/or Banister spent more than a fleeting amount of time searching the property, and therefore the time of the underlying burglary/robbery was not short. There was also evidence Keeley was bound and had defensive wounds. Moreover, since there was evidence Cody participated in the victim's beating, which occurred prior to the strangulation, it is also a reasonable inference that Cody had an opportunity to stop the killing, or at least to help 75-year-old Keely at some point during the burglary/robbery, and Cory failed to minimize the possibility of violence.

In sum, we conclude substantial evidence supports the trial court's factual finding that Cody acted with reckless disregard for human life.

Cody cites *Ramirez*, *supra*, 71 Cal.App.5th 970, in which a Court of Appeal reversed a trial court's denial of a defendant's section 1172.6 petition following an evidentiary hearing. Cody argues the circumstances in *Ramirez* are "very analogous to this case" and compel the same result. We disagree.

In 2005, Juan Carlos Rios approached the driver's side of a car that was

stopped on the street and asked the driver "for a cigarette. The driver said that he did not have one." (*Ramirez, supra*, 71 Cal.App.5th at p. 978.) Thereafter, Rios whistled, and 15-year-old Omar Rigo Ramirez and another young male approached the passenger side of the vehicle. "Rios drew a gun and told [the driver] to park the car and get out." (*Ibid.*) Rios told a passenger "that nothing would happen to him if he got out of the car." (*Ibid.*) The passenger "started to get out of the car. Rios was arguing with [the driver], who then began to drive away. Rios fired several shots at the car. One of the bullets struck [the driver], who lost control of the vehicle." (*Ibid.*, fn. omitted.) Ramirez and Rios ran away in different directions; the driver "died from a gunshot wound to his torso." (*Ibid.*) The judgment and sentence were affirmed on direct appeal.

In 2019, Ramirez filed a section 1172.6 petition seeking to vacate his murder conviction. (*Ramirez, supra*, 71 Cal.App.5th at p. 975.) Following an evidentiary hearing, the trial court denied the petition, finding Ramirez "was a major participant in the attempted carjacking and acted with reckless indifference to human life." (*Id* at p. 983.) The Court of Appeal disagreed and reversed: "Ramirez did not provide the murder weapon, instruct his confederate to shoot, or know of his confederate's propensity toward violence, and the shooting occurred quickly without Ramirez having a meaningful opportunity to intervene. Although Ramirez was aware his confederate had a gun and intended to use it in the carjacking, as a 15-year-old he may well have lacked the experience and maturity to appreciate the risk that the attempted carjacking would escalate into a shooting and death, and he was more susceptible to pressure from his fellow gang members to participate in the carjacking. Thus, there is not substantial evidence Ramirez acted with reckless indifference to human life." (*Id*. at p. 975.)

In this case, Cody was 27 years old at the time of Keeley's murder, and therefore it is a reasonable inference that he did have the experience and the maturity to appreciate the risk that the crime could escalate into Keeley's death. There was also

31

evidence Cody played a significant role in the planning and execution of the burglary/robbery, and that he was present and may have participated in the brutal beating and ultimate death of Keeley. And certainly, unlike the situation in *Ramirez*, the murder of Keeley did not occur spontaneously or quickly; thus, it is a reasonable inference that Cody did, at a minimum, have a "meaningful opportunity to intervene." (*Ramirez*, *supra*, 71 Cal.App.5th at p. 989.) In short, *Ramirez*, does not alter our analysis.

Finally, Cody argues that the federal court's 2016 order vacating the special-circumstance enhancement, and the Riverside County District Attorney's 2017 decision not to retry the allegation "is entitled to great weight." We disagree.

In 2016, the federal court did <u>not</u> find there was insufficient evidence Cody was a major participant who acted in reckless disregard for human life. Rather, the court held that in the absence of the proper jury instruction (CALCRIM No. 703), the federal court could not determine that the trial court's instructional error was harmless beyond a reasonable doubt. And as far as the prosecution's 2017 decision not to retry Cody on the felony-murder special-circumstance allegation, we simply do not know what type of evidentiary considerations factored into that decision. That is, the testimonial statements of witnesses absent from a retrial may ordinarily be admitted only where the witness is declared unavailable. (See Evid. Code, § 1291.) However, at the 2021 evidentiary hearing the prosecution was permitted to rely on the trial transcripts without a finding of witness unavailability. (See *ante*, pt.II.A.)

To reiterate and conclude, we hold: A) the trial court properly relied on the 2012 trial transcripts at the evidentiary hearing; B) the court applied the correct burden of proof (beyond a reasonable doubt); and C) there was substantial evidence to support the court's determination that Cody is guilty of felony murder under current law (that he was a major participant in the underlying felony, and he acted with reckless indifference to human life). Thus, Cody is therefore ineligible for relief under section 1172.6.

### III

### DISPOSITION

The trial court's order denying Cody's section 1172.6 petition is affirmed.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.

Filed 5/31/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G060218 |
|      v. | (Super. Ct. No. INF10000236) |
| TRAVIS MARTIN CODY, | ORDER GRANTING REQUEST FOR PUBLICATION |
|    Defendant and Appellant. | |

The Attorney General has requested that our opinion, filed on May 11, 2023, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.


GOETHALS, ACTING P. J.

I CONCUR:


MOTOIKE, J.